509 P.2d 1030

**EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Petitioner,**

**Saga Food Service, Employer,**

**v.**

**Willie P. CONTRERAS and the Industrial Commission of Arizona, Respondents.**

**No. 11015–PR.**

Supreme Court of Arizona, En Banc.

May 14, 1973.

Motion for Rehearing Denied June 5, 1973.

Browder & Gillenwater by Robert W. Browder and David W. Adler, Phoenix, for petitioner.

Lindauer & Goldberg by Mark H. Goldberg and William B. Revis, Gorey & Ely, Phoenix, for respondent Contreras.

William C. Wahl, Jr., Phoenix, for respondent The Industrial Commission of Ariz.

HAYS, Chief Justice.

This is a petition to review a decision of the Court of Appeals, Division One, reported at 18 Ariz.App. 48, 500 P.2d 308 (1972), setting aside an award of the Industrial Commission of Arizona. The decision of the Court of Appeals is vacated and the award of the Industrial Commission is reinstated.

William Contreras was 42 years old and had been employed by Saga Food Service for approximately 20 years. At the time of his injury he was the assistant manager of Saga's Cafeteria in Palo Verde Main Dormitory at Arizona State University. Many of Contreras's duties were to fill in for employees who failed to show up. He was often called upon to wield a mop, wash dishes, serve food, fill the coffee urn or milk machine, etc. His duty was to keep the place running smoothly and do whatever was necessary to accomplish that result.

In February, 1969, while bending down to pick up a box filled with dishes, he sprained his lower back. The claim was accepted as compensable by the insurance carrier, Employers Mutual Liability Insurance Company of Wisconsin. Dr. Marion Peterson, an orthopedist, treated him. In October, 1969, he performed a laminectomy which at first appeared to relieve the patient's pain. The doctor released him for light duty commencing October 30, 1969, and the employer assigned him to the snack bar in the Union at Arizona State University.

At the snack bar, the duties he was called upon to perform were not essentially different from what he did before the back injury, except that the snack bar was a much smaller business. Soon thereafter, Contreras found that any lifting resulted in pain in his leg. He continued to see his doctor monthly, but the doctor was unable to do anything to help him. Visits consisted of interviews, examinations, prescriptions for pain pills, and continued observation.

On March 17, 1970, the employee was laid off because of either inability or unwillingness to do some of the chores associated with his job, such as carrying six-gallon containers filled with milk, standing on a stool to fill the coffee urn, stooping over to get the water to pour into the urn, etc. He has not worked anywhere since, although the record contains ample evidence of his trying to get a job that he could handle. In September, 1970, he changed to Dr. Howard Aidem, another orthopedist, primarily because the latter's office was closer to the employee's home. Average wage at the time of the injury was $630 per month.

*The physician's release of Contreras shows on its face that further treatment was needed, and that the release was for light duty only.*

On February 19, 1970, about one month before being laid off, Contreras received from the insurance carrier a Notice of Claim Status terminating his temporary compensation as of October 30, 1969, on the ground that he had been released on the latter date, by his doctor, *for regular work*. This notice was protested and a hearing was held.

On December 9, 1970, the hearing officer made the following specific findings of fact, *inter alia*:

1. The applicant's condition was not yet stationary.

2. He was laid off on March 17, 1970, because he was *unable to physically perform* all of the duties required.

3. He unsuccessfully made a conscientious effort to find a job within the limits of his physical capabilities.

4. That Dr. Aidem testified that although the employee's condition was not yet stationary, he could perform light work that involved no bending and no lifting of items weighing over 25 pounds, but could stoop or walk without limitation, and that in his opinion the employee could perform the duties of assistant manager of a snack bar. That these two opinions seem to be in conflict, and when that situation exists the Commission may choose which opinion to follow.

5. The applicant had sustained his burden of proof.

6. The employee is entitled to temporary total disability benefits from February 10, 1969, through October 30, 1969, and to temporary partial disability status until a further administrative determination is made.

An award was made to conform to the above findings and, on the carrier's request for review, the Commission affirmed that award.

The carrier took the decision to the Court of Appeals which set aside the award.

Unfortunately, the record is confused because of the failure to pin down the medical testimony and to resolve its conflicts by more careful questions. For example, the employee testified that he had to step up on a stool in order to pour water into the top of the large commercial-size coffee urn at the snack bar, and had to bend down to refill the pitcher several times in the course of the filling. When Dr. Aidem was testifying, he was asked what physical motions Contreras was capable of performing. He answered that he should be capable of walking "within reasonable limits, almost unlimited." He also stated that the employee would not be able to sit for a continuous period of more than 30 to 45 minutes, that lifting would be restricted to twenty to twenty-five pounds, and bending should be "just about totally restricted." Further, "the man has limita-

tion of motion; and that lateral bending and rotation cause pain." Despite these limitations, the doctor thought that, "from the description [of the snack bar job] forwarded to me" he could handle that work. He went on to say that his opinion was based on a "very nice note somebody sent me, which describes the job. . . . It has not got any signature on it." He then testified that Contreras could wait on customers, make coffee and sandwiches, stock the shelves, sit on a stool as cashier, do some cleanup work, help wash dishes, and serve in a cafeteria line. This is in direct contradiction to the pain, limited range of motion, inability to bend, etc. It would be difficult to stock the bottom shelf without bending unless one were to sit on the floor. Nothing is said about the possibility that, while acting as cashier, he might be required to continue to so act for more than the 45 minutes previously mentioned as his limit. The doctor said that he was familiar with commercial coffee urns, but he did not state that he knew whether the water used to fill the pitcher to fill the urn in the snack bar came from a tap that required Contreras to bend to reach it. The evidence indicated that the employee had to fill the milk machine by carrying six-gallon containers of milk. This Court will take judicial notice of the fact that six gallons of milk weighs over 50 pounds—double the weight that Dr. Aidem testified was the limit of what Contreras should be permitted to lift. The doctor testified that if the milk weighed over 25 pounds, it would be "a contraindicated activity." We must, therefore, conclude that the doctor's testimony contained inherent contradictions caused by insufficient knowledge of the physical facts involved in the job at the snack bar.

In Adkins v. Industrial Commission, 95 Ariz. 239, 243, 389 P.2d 118, 120, we said:

But a medical expert is not ordinarily qualified by experience to state an opinion as to whether a claimant with his present disabilities is able to carry out the skills of a particular job—such as here, a diesel mechanic and welder.

Nowhere in the record is there any indication that Contreras was malingering. The doctors did not say so, and the carrier's attorney did not suggest it. There were objective findings to support the employee's complaints of pain in his back, leg and fingers. These were: decreased sensation over the lateral aspect of the right leg, questionable weakness about the right foot, complete absence of reflex of the right ankle.

The basis of the carrier's refusal to accept the order to pay is that the employee was released by his doctor for regular work. There is no truth in that statement. The transcript shows the following question and answer:

"Q. Doctor, you have not released Mr. Contreras?

"A. That's correct."

We hold that the employee was still partially disabled.

■■ The main issue argued is whether the employee's condition had become "stationary." Under the law, when the employee's condition becomes stationary, no more partial temporary disability benefits may be paid; instead, it becomes the duty of the Commission to determine the extent of the permanent residual disability, if any. The difficulty is that there is no clear definition of "stationary" available. In our opinion, a man's condition becomes stationary when his disability ceases to decrease and his physical condition ceases to improve. In the instant case, the patient's own physician asked for a group consultation to see whether another specialist might have something to suggest. For reasons not appearing in the record, this request was neither granted nor refused. He then set up an appointment with a neurologist to see if that doctor could come up with a suggestion. The hearing took place before the appointment date. The employee's attorney should have insisted that the hearing await one or both of the examinations so that someone would be competent to say with some degree of finality that the patient had been taken along the recovery route as far as possible. Instead, the record shows that Dr. Aidem testified that he was seeing the patient monthly; that the patient was still under his active medical care; that when he saw the man on May 20, 1970, he didn't think his condition was stationary; and that when he saw the man again in September, his condition was worse, in that he had more complaints and more restriction of leg motion.

Despite these observations, when asked whether he thought Contreras's condition was stationary, he said:

From my point of view orthopedically, I think it is stationary because of the period of time since his last surgery and the fact that his complaints didn't seem to be particularly different. . . . I really have no more treatment plans for him.

Doctor Peterson testified that he continued to see him monthly until July, 1970; that his condition had not changed for months, "so that I guess we would have to consider it medically stationary." When asked whether he thought the patient should keep seeing a doctor, or be released, he answered: "Well, much of a patient's care with back problems are that they have to treat themselves. . . . This goes on for a lifetime."

The record contains a letter from Contreras to the Commission received January 21, 1971, enclosing some information which had been requested, and containing his statement that:

By the way, I just thought I'd let you know that I have to use a cane to walk with, and I'm living on pain pills and sleeping pills. I seem to have gotten worse after I was given spinal block shots.

■ In the absence of a group consultation which includes a neurologist, and in the present state of the record, we find it impossible to say that there is not sufficient evidence to support the award. Undoubtedly, by now, the doctors treating this man are in a much better position to ascertain whether his condition is stationary,

and if it is, to determine the amount of permanent disability that must be awarded.

The decision of the Court of Appeals is vacated and the award of the Commission dated January 26, 1971, is reinstated.

CAMERON, V. C. J., and STRUCK-MEYER, LOCKWOOD and HOLOHAN, JJ., concur.