**FLUOR ALASKA, INC. and Alaska Pacific Assurance Company, Appellants,**

v.

**Albert F. MENDOZA and the Alaska Workers' Compensation Board, Appellees.**

**No. 4992.**

Supreme Court of Alaska.

Sept. 19, 1980.

---

Charles P. Flynn, Burr, Pease & Kurtz, Inc., Anchorage, for appellants.

Bradley D. Owens, Jermain, Dunnagan & Owens, Anchorage, for appellees.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Chief Justice.

In this appeal, we are confronted with an issue of first impression in post–statehood Alaska, namely, the proper interpretation of AS 23.30.095(d). That statute, part of the Alaska Workers' Compensation Act, provides:

> If at any time during the period [of disability] the employee unreasonably refuses to submit to medical or surgical treatment, the [Alaska Workers' Compen-sation] [B]oard may by order suspend the payment of further compensation while the refusal continues, and no compensa-tion may be paid at any time during the period of suspension, unless the circum-stances justified the refusal.

We must determine whether Albert Mendoza's refusal to undergo a lumbar laminecto-my [1] was unreasonable.

Mendoza is fifty years old and has done iron work for most of his adult life. On March 8, 1976, he was injured while work-ing for Fluor Alaska, Inc. Mendoza subse-quently returned to his home in Tucson, Arizona, where he was treated by a chiro-practor. The chiropractor and a medical doctor who examined Mendoza both con-cluded that he would be unable to return to iron work.

Fluor Alaska's workers' compensation in-surance carrier, the Alaska Pacific Assur-ance Company (ALPAC), arranged to have Mendoza seen by a neurosurgeon in Tucson, Dr. Charles Needham. Dr. Needham tenta-tively diagnosed Mendoza's injury as a rup-tured lumbar disc, and recommended a lum-bar myelogram for a more certain diagno-sis.[2] The myelogram confirmed Dr. Need-ham's initial opinion. He therefore sched-uled Mendoza for the laminectomy. How-ever, shortly before the operation was scheduled, Mendoza declined to go through with it, because of his fear of dying on the operating table.

A few months later, Mendoza was seen by still another doctor, John Utz.[3] Dr. Utz placed Mendoza on a "conservative treat-ment program," and recommended a group of consultation between himself, Dr. Need-ham and a third doctor who had seen Men-doza at ALPAC's request. This group con-sultation took place in May 1977, and pro-duced a consensus that Mendoza could not return to iron work but could work full time at a more sedentary job, and that "at

---

1. A lumbal laminectomy is the surgical removal of the posterior arch of a vertebra in the lum-bar portion of the backbone.

2. In a myelogram, an iodine fluid is injected into the patient's backbone, so that X–rays can be taken of the soft spinal cord itself, rather than just the boney vertebrae encasing it. *See* 3 M. Houts and L. Marmor, Proving Medical Diagnosis and Prognosis § 75.01 (1978).

3. The record does not indicate whose decision it was for Dr. Utz to examine Mendoza.

this time . . . surgery would not be a recommended procedure."

In November 1977, ALPAC formally requested permission from the Alaska Workers' Compensation Board (Board) to halt Mendoza's compensation benefits based, among other things, on his failure to undergo the laminectomy. In a hearing held December 14, 1977, the Board decided that compensation should be continued until March 1, 1978, to allow Mendoza time to overcome his fear of surgery. In January, Mendoza informed the Board that he had definitely decided not to undergo surgery and requested a hearing on the continuation of his benefits. A second hearing was held on February 22, 1978, at which Mendoza testified and submitted the recently taken deposition of Dr. Needham. In April, the Board denied ALPAC's request, finding that Mendoza's refusal to undergo surgery was reasonable. The Board noted the difficulties that several members of Mendoza's family had had with different operations,[4] and stressed Dr. Needham's view, expressed in his deposition, that surgery was only fifty percent likely to relieve Mendoza's back and leg pains. But the Board ordered Mendoza to get psychological counseling, at ALPAC's expense, to try to overcome his fear of surgery.

Mendoza's visit to a Tucson psychiatrist proved unsuccessful, the psychiatrist concluding that Mendoza was not a "candidate for psychotherapeutic intervention at this time." In June 1978, ALPAC therefore moved the Board to modify its prior decision and allow ALPAC to suspend payments to Mendoza. The Board, in a second opinion issued in January 1979, declined to make this modification, and ordered ALPAC to continue payments.

ALPAC then shifted its efforts to the superior court. It had filed a notice of appeal following the Board's initial decision, but hearing of that appeal had been stayed

pending ALPAC's modification motion before the Board. On August 16, 1979, Judge Rowland affirmed the Board's ruling. He concluded that its decision was supported by substantial evidence.

■ ALPAC first challenges the superior court's ruling that "[t]he question of the reasonableness of Appellee's refusal was one of fact to be determined by the Board." ALPAC claims that the reasonableness issue here is one of statutory interpretation, so that the Board's decision is not entitled to deference. Professor Larson's treatise on workers' compensation labels the reasonableness question a "complex fact judgment involving a multitude of variables." 1 A. Larson, The Law of Workmen's Compensation § 13.22, at 3–419 (1978). Because the question is a complex one, a reviewing court will have to closely examine the evidence on which the Board relies. Thus, the Board's decision will be affirmed only if it is supported by substantial evidence.[5] It follows that here the superior court applied the appropriate standard of review.

■ ALPAC next argues that an objective standard of reasonableness must be applied, and that the Board erred in applying a subjective standard of reasonableness. Review of the record persuades us that the Board did not apply a subjective standard. In both of the opinions it issued in this case, the Board did not rest its decision exclusively on Mendoza's fears; rather, it attempted to consider the complex factors that are inherent in balancing the chances for success and probable results of the operation against the possible adverse consequences. This is the reasonableness test used by most courts. *See* 1 A. Larson, *supra*, at 3–410 to 3–423 [footnotes omitted]:

[I]f there is a real risk involved [in surgery], and particularly if there is considerable chance that the operation will result in no improvement or even perhaps in a worsening of the condition, the

4. Mendoza testified that his wife had a near-fatal cardiac arrest while on the operating table, and that his aunt and his niece both died during the course of simple operations.

5. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. ITT Arctic Serv.*, 577 P.2d 1044, 1049 (Alaska 1978).

claimant cannot be forced to run the risk at peril of losing his statutory compensation rights. In such cases, and particularly in the commonest operations presenting this problem—hernia and intervertebral disc—most courts will not at present disturb a finding that refusal to submit to the operation is reasonable, since the question is a complex fact judgment involving a multitude of variables, including claimant's age and physical condition, his previous surgical experience, the ratio of deaths from the operation, the percentage of cures, and many others. The matter cannot be determined automatically as a matter of medical statistics and expert testimony. The surgeon who sees several operations every day and who testifies that the chance of fatality is only five percent naturally has a different point of view than the claimant who has never had a major operation and might quite understandably prefer to enjoy life as best he can with his injury rather than take a one–in–twenty chance of being dead. In the words of the Oklahoma court: 'The State Industrial Commission is without jurisdiction to order the employee to submit to a major operation involving a risk of life, however slight, merely in order that the pecuniary obligations created by the law in his favor against his employer may be minimized.'

■ We thus must decide whether the Board's conclusion that Mendoza's refusal of surgery was reasonable was supported by substantial evidence. ALPAC contends that those cases upholding refusal as reasonable are based on the employee's conscious weighing of the potential advantages and risks of a particular operation, whereas Mendoza's refusal was wholly irrational, based only on his fear of any surgery. It is

true that Mendoza's explanations of his refusal contain no indications of weighing. Indeed, we would infer from Mendoza's testimony and deposition that he probably would have refused even simple, risk–free surgery, as his relatives' complications all arose during simple operations. But it is also true that Mendoza was aware of the risks the laminectomy posed. We believe that AS 23.30.095(d), construed in accordance with the "liberal humanitarian purposes" of the workers' compensation act,[6] requires that a refusal be held reasonable if a conscious weighing of the results of having surgery or not having surgery could have led to the refusal, regardless of whether such weighing actually occurred.[7]

■ We have concluded that there was sufficient evidence to support the Board's decision that Mendoza's refusal of the laminectomy was reasonable. Dr. Needham's initial assessment of the surgery, before Mendoza's condition had deteriorated, was that there was a ninety percent chance of reducing "most or all of the bad pain that radiated into his leg," with a two percent chance of "wound infection or some other problem with healing," and one chance in 400 of paralysis of a foot. The doctor could not state what Mendoza's postsurgery disabilities would be; he wrote that this "depend[s] on the findings at surgery and his postoperative course and cannot be determined in a scientific manner in advance." Further, by the time ALPAC formally requested the Board, in November 1977, to halt Mendoza's compensation payments, based on his failure to undergo the laminectomy, Dr. Needham indicated that Mendoza had no better than a fifty percent chance that the surgery would significantly relieve his leg and back pains. Additionally, the Board had before it the May 1977 group

6. *Burgess Constr. Co. v. Lindley*, 504 P.2d 1023, 1025 (Alaska 1972).

7. Our research has not discovered any cases squarely ruling one way or the other on this point. We have found one case that may support our view. *Thibodeau v. Etscovitz Chevrolet*, 365 A.2d 804 (Me.1976), upheld the claimant's refusal to undergo knee surgery termed "not difficult" by the surgeon who saw the claimant after her accident. The claimant refused surgery because of her fear of the consequences to her children if she were crippled or died. Her refusal was termed reasonable because of her age and various health problems. The opinion unfortunately does not establish whether the claimant's fears were general ones, like Mendoza's, or were specifically related to her age and health problems.

evaluation of Drs. Utz, Needham and Clark which recommended against surgery for Mendoza.[8]

We also conclude that the Board did not err in considering the terrible experiences that several of Mendoza's close relatives had had with surgery.[9] In *Cate v. M.S. Perkins Machine Co., Inc.*, 102 N.H. 391, 157 A.2d 778 (1960), the court considered the claimant's long history of unfortunate experiences with doctors in general, and not just surgeons, in upholding the reasonableness of the claimant's refusal of a laminectomy. We see no reason why the Board should not take into account a claimant's first–hand knowledge of surgical mishaps.

The judgment of the superior court is AFFIRMED.

BOOCHEVER, J., not participating.

---

8. Implicit in the foregoing is our rejection of Fluor's contention that the Board erred in evaluating the reasonableness of Mendoza's refusal to consent to surgery as of the time of the hearing which followed ALPAC's formal request to terminate compensation payments pursuant to AS 23.30.095(d).

9. *See* note 4 *supra*.